

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed July 12, 2011**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CHAPTER 7 |
| SCOTT C. SHERMAN, | § § | |
| Debtor. | § § § | CASE NO. 09-42949 (DML) |

---

| | | |
|---|---|---|
| CREDIT UNION LIQUIDITY SERVICES, LLC F/K/A TEXANS COMMERCIAL CAPITAL, L.L.C., | § § § § | |
| Plaintiff, | § § | |
| v. | § § | ADVERSARY NO. 10-04131 |
| SCOTT C. SHERMAN, | § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION

1

Before the court is the *Complaint Objecting to Discharge* (the "Complaint") filed by Credit Union Liquidity Services, LLC f/k/a Texans Commercial Capital, L.L.C. ("CULS" or "Plaintiff") in the above-captioned adversary proceeding. The court conducted a trial of this adversary proceeding (the "Hearing") over 2 days.[1] During the Hearing, the court heard testimony from Scott C. Sherman ("Debtor"). The court also received into evidence exhibits identified as necessary below.

This adversary proceeding is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(J). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. Background

Debtor executed and signed two separate guaranty agreements in favor of CULS (the "Guaranty Agreements"), the first on January 14, 2005, and the second on April 19, 2006. By the Guaranty Agreements, Debtor became a guarantor of $7,900,000 owed to CULS by GP&E Operating, LP and GP&E Leasing, LP (the "Primary Obligors"), companies controlled by Debtor's father, Harry C. Sherman, and other individuals. *See* Ex. 4 at 1; Ex. 5 at 1; TR February 16, 2011 at 12:4-23.[2]

The Primary Obligors subsequently defaulted on their obligations to CULS. CULS then initiated a lawsuit (the "State Court Lawsuit") on September 6, 2007, in the District Court of Dallas County, Texas, 68th Judicial District (the "State Court"), in part to enforce its rights against Debtor under the Guaranty Agreements.[3] On September 11, 2008, the State Court

---

[1] February 16, 2011 and April 21, 2011.

[2] Citations to the transcript of the Hearing appear in the following format: TR [date] at [page:line].

[3] The State Court Lawsuit included claims against Debtor and against entities owned or controlled by him, including a limited partnership named Sherdon, LP ("Sherdon").

entered an order granting partial summary judgment in favor of CULS, holding Debtor liable to CULS under the Guaranty Agreements for $9,516,413.65, plus interest. *See* Ex. 32 at 2.

Thereafter, CULS pursued other causes of action in the State Court Lawsuit, one of which was a fraud claim against Debtor. CULS eventually filed a summary judgment motion (the "MSJ") respecting its remaining claims in the State Court Lawsuit, including the fraud claim. The State Court set the MSJ for a hearing to be held on February 2, 2009.

Shortly before that date, Debtor caused Sherdon to file a chapter 7 petition in this court (the "Sherdon Bankruptcy"). *See id.* at 26:22-24. Debtor testified at the Hearing that he intended by the Sherdon Bankruptcy to "buy time" to negotiate a contract with Henry Jan ("Jan"),[4] by which Debtor hoped to gain additional assets to satisfy his creditors. *See id.* at 24:2-17.[5] Thereafter, the claims against Sherdon were severed and the remaining claims, including the fraud claim against Debtor, were remanded back to the State Court.

The MSJ was again set for hearing, this time for March 9, 2009. Shortly before that date, Debtor filed a chapter 7 petition in this court (the "First Personal Bankruptcy"). *See* TR February 16, 2011 at 33:10-11. Debtor later testified during the Hearing that, as was the case with the Sherdon Bankruptcy, Debtor's primary motivation behind filing the First Personal Bankruptcy was to prevent CULS from obtaining a judgment against Debtor on its fraud claim. *See id.* at 34:14-17, 36:7-20. Debtor did not file any schedules in the First Personal Bankruptcy and the case was dismissed. *See id.* at 34:10-13.

---

[4] Jan is chief executive officer of an entity known as Healthcare of Today, Inc. ("Healthcare of Today"), which was formerly known as ILN Industries. *See* TR February 16, 2011 at 31:9, 64:18-21.

[5] Debtor first admitted his intention to delay the initial hearing on the State Court MSJ in a deposition taken on August 5, 2009. *See Oral Deposition of Scott Sherman*, August 5, 2009, at 19:19-20:8, admitted into evidence at the Hearing.

The MSJ was then scheduled for hearing a third time, this time for May 22, 2009. Debtor filed a chapter 11 petition (the "Second Personal Bankruptcy") shortly before that date, thereby commencing the above-captioned bankruptcy case.[6] As with the Sherdon Bankruptcy and the First Personal Bankruptcy, the Second Personal Bankruptcy was an effort to keep CULS from obtaining a fraud judgment against Debtor in the State Court Lawsuit. *See id.* at 37:11-38:5.

Debtor filed schedules (the "Schedules") and a Statement of Financial Affairs (the "SOFA")[7] in the Second Personal Bankruptcy. However, he failed to include in these documents certain assets and transfers that CULS argues were required to be disclosed. These omissions (collectively, the "Omissions") include:

- The Sherman Irrevocable Trust (the "Trust"), which was formed on October 31, 2007, and of which Debtor and his wife are trustees and beneficiaries. *See* Ex. 21 at 1.

- Real property in New Mexico (the "New Mexico Property"), to which Debtor and his wife acquired title around April 28, 2008. *See* Ex. 15.

- An agreement (the "Acquisition Agreement") between Debtor (on behalf of certain Debtor-controlled entities and the Trust) and Jan (on behalf of Healthcare of Today), in consideration of which Debtor was supposed to transfer all the assets of certain Debtor-controlled entities to Healthcare of Today, in exchange for which Healthcare of Today was to issue 1.2 million shares of its common

---

[6] The Second Personal Bankruptcy was converted to a chapter 7 case on October 22, 2010.

[7] The Schedules and the SOFA are available in Plaintiff's exhibit binder entitled *Selected Bankruptcy Pleadings*, admitted into evidence at the Hearing.

4

stock, with 100,000 shares going to Debtor and 1.1 million shares to the Trust.[8] *See* Ex. 27. Jan estimated the shares to be worth $12 each. *See* Ex. 28 at 28.[9]

- Sale of stock in various companies (the "Stock Sale") for $17,501, on or around October 13, 2008. *See* Ex. 12. Debtor is not a stockbroker, and does not frequently buy or sell large blocks of stock. *See* TR April 21, 2011 at 106:5-6.

- Transfer of certain mineral interests on May 12, 2009, by a Mineral and Royalty Deed (the "Mineral Deed") to Double V Resources, L.L.C. and J. Carson Dickie. *See* Ex. 22. Also in May 2009, Debtor caused Sherman Harthcock Family LP (the "Family Partnership"), a partnership controlled by Debtor and his wife, to sell certain mineral rights in exchange for hundreds of thousands of dollars.[10] *See* TR April 21, 2011 at 86:13-87:7; Ex. 24.

Plaintiff objected to Debtor's discharge in the Second Personal Bankruptcy based on the Omissions and the transactions underlying the Omissions. Whether the Omissions provide grounds for denying Debtor's discharge pursuant to Code § 727(a) is the subject of this memorandum opinion.

## II. Discussion

At issue here is CULS's general objection to Debtor's discharge. Plaintiff grounds the Complaint in three provisions of Code § 727(a). Section 727(a) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

---

[8] The transaction contemplated by the Acquisition Agreement has never closed. *See* TR February 16, 2011 at 63:16-18.

[9] Jan did not testify at the Hearing. Exhibit 28 is Jan's testimony from a deposition taken on March 10, 2010.

[10] Exhibit 24 shows an incoming wire transfer from EnergyNet.com to the Family Partnership's bank account in the amount of $287,975. It is not apparent from the record whether this transfer represents all the consideration received by the Family Partnership as a result of this transaction.

5

>           . . .
>           (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>                    (A) property of the debtor, within one year before the date of the filing of the petition; or
>                    (B) property of the estate, after the date of the filing of the petition;
>           …
>           (4) the debtor knowingly and fraudulently, in or in connection with the case—
>                    (A) made a false oath or account;
>           . . .
>           (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

Code § 727(a).

If any of these provisions justifies denying Debtor's discharge, the court need not decide the applicability of the others. *See Hibernia Nat'l Bank v. August Perez, III (In re Perez)*, 954 F.2d 1026, 1027 (5th Cir. 1992). Because Plaintiff has carried its burden with respect to section 727(a)(4)(A), the court need not consider whether Debtor should be denied a discharge under the provisions of subsections (a)(2) and (a)(5).

A party objecting to a discharge under section 727(a)(4)(A) must establish each of five elements by a preponderance of the evidence: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was materially related to the bankruptcy case. *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992); *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001); *Cadle Comp. v.*

*Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862 (5th Cir. 2004). The court will consider these elements in turn.

### i. Did Debtor make a false statement under oath?

CULS must first establish that Debtor made a false statement under oath. An omission in a debtor's schedules or statement of affairs is a false oath justifying denial of the debtor's discharge. *See Beaubouef*, 966 F.2d at 178 (citing 4 COLLIER ON BANKRUPTCY ¶ 727.04[1] (15th ed. 1992)). Each of the Omissions therefore constitutes a false statement under oath, and the first two elements of section 727(a)(4)(A)'s test are met.

### ii. Did Debtor make the Omissions with fraudulent intent?

The third and fourth elements CULS must establish are that Debtor knowingly made the Omissions with fraudulent intent. CULS can satisfy these two elements either by showing that Debtor had actual intent to deceive, or by providing sufficient evidence for the court to find that the Omissions were the result of a reckless disregard for the truth. *See Sholdra*, 249 F.3d at 382; *Mitchell*, 102 Fed. Appx. at 862.

Debtor argues that several of the Omissions were either reasonable or based on honest mistakes, and thus do not show an intent to deceive. With respect to the New Mexico Property, Debtor argues that he believed when he initially filed the Schedules that the Trust was the true owner of that property.[11] This assertion is contradicted by substantial evidence in the record, including a warranty deed granting the New Mexico Property to Debtor and his wife, a mortgage document signed by Debtor, a closing document from Ruidoso Title Company addressed to Debtor, a property tax bill addressed to Debtor, a check drawn on Debtor's personal bank

---

[11] Even if the Trust did in fact own the New Mexico Property, the court questions whether it would have been appropriate for Debtor not to list the New Mexico Property in the Schedules or the SOFA, given Debtor's status as trustee and beneficiary of the Trust.

7

account to cover a mortgage payment, and Debtor's 2008 tax return listing the New Mexico Property as an asset of Debtor. *See* Exs. 12, 13, 15-17, 20. Based on this evidence, the court finds that Debtor's omission of the New Mexico Property was not the result of an honest mistake or a reasonable belief that Debtor had no interest in the New Mexico Property, but rather the product of an attempt to knowingly and fraudulently conceal assets.

Debtor also argues that he was not required to disclose the Acquisition Agreement, as the transaction contemplated by that agreement had not been consummated when Debtor filed the Second Personal Bankruptcy. Debtor further argues that he signed the Acquisition Agreement not in his capacity as an individual, but rather on behalf of Artisan LH, LLC, Artisan Operating, LP, Artisan Lifestyle Homes, and the Trust.[12]

Presumably Debtor's argument is that he had neither received nor transferred assets in connection with the Acquisition Agreement when he filed the Second Personal Bankruptcy, and also had no expectant interest in the transaction at that time. This argument makes no sense. The Acquisition Agreement was to provide a benefit to Debtor, as $1,200,000 worth of shares were to go to Debtor and $13,200,000 to the Trust, of which Debtor is a beneficiary. Debtor had an expectant interest in the transaction's closing, and, to the extent failure to consummate the transaction was due to the actions of Healthcare of Today, a claim for breach of contract against that entity that should have been disclosed in response to Question 21 of Schedule B. Even if Debtor did not believe his interest in the Acquisition Agreement to be specifically addressed by the questions in the Schedules, Question 35 in Schedule B asks for "other personal property of any kind not already listed."

---

[12]   Debtor testified that there was a mistake in the Acquisition Agreement, which was offered as Exhibit 27. The entity labeled as "Artisan LH, LLC" should be Artisan Lifestyle Homes, and the other two Artisan entities involved in the Acquisition Agreement are Artisan Operating, LP and Artisan Operating, GP. *See* TR February 16, 2011 at 62:11-63:1.

8

Debtor further argues that he need not have disclosed the Stock Sale since, notwithstanding that Debtor is not a licensed stockbroker, the sale was in his ordinary course of business and therefore not a necessary disclosure in response to Question No. 10 of the SOFA. *See* TR April 21, 2011 at 106:5-6. Debtor was, in actuality, a contractor who primarily built residential homes. *See* TR February 16, 2011 at 9:8-14. Though Debtor testified that he traded stock every six to seven weeks through his stockbroker, his 2008 tax return lists only two stock transactions.[13] Nor would evidence of such other trades, without more, allow the court to conclude that the Stock Sale itself occurred in the ordinary course of Debtor's business.

With respect to Debtor's failure to disclose the execution of the Mineral Deed and the sale of mineral rights by the Family Partnership, Debtor does not dispute that he should have listed these transfers in response to SOFA Question No. 10. Debtor does, however, claim that disclosure in Schedule B of the cash proceeds received on account of the Mineral Deed was tantamount to disclosure of the transaction itself. The court disagrees. Even assuming disclosure of proceeds received as a result of a transaction is the same thing as disclosure of the underlying sale – which it is not – a false answer to SOFA Question No. 10 cannot be cured by providing true information in response to another question. *See Mitchell*, 102 Fed. Appx. at 863.

The court therefore finds and concludes that, contrary to Debtor's assertions, the Omissions were neither reasonable nor based on honest mistakes. Were that the case, however, the court would still find that CULS has met its burden with respect to the third and fourth elements, as reckless disregard for the truth may be evidenced by the cumulative effect of

---

[13] Debtor believes that some transactions may have been left off of the tax return, including trades through other entities, but he provided no evidence of any such transactions. *See* TR April 21, 2011 at 107:24-108:7.

9

multiple omissions or misstatements taken together. *See Sholdra*, 249 F.3d at 382; *Mitchell*, 102 Fed. Appx. at 862-63 & n.3; *Guenther*, 333 B.R. at 767.

In response to this argument, Debtor points to *Mitchell* for the proposition that a minimum of six errors must be present in schedules for a court to find reckless disregard for the truth based on the cumulative effect of multiple false statements or omissions. *Mitchell* may stand for the proposition that a court should find reckless disregard for the truth whenever a debtor's schedules contain *at least* six errors, but it does not preclude the court from making such a finding when the schedules at issue contain less than six errors and the circumstances are otherwise appropriate. *See Mitchell*, 102 Fed. Appx. at 862.

The court also believes that a finding of reckless disregard for the truth depends not only on the number of errors and omissions, but also on their significance. The Omissions were numerous and significant; the Acquisition Agreement, the Stock Sale, and the Mineral Deed represent total value of roughly $14,460,000 in asset transfers that Debtor failed to disclose.[14] The court finds that there is sufficient evidence in the record to infer a reckless disregard for the truth, and therefore fraudulent intent on the part of Debtor.

### iii. Were the Omissions Material?

The final element of section 727(a)(4)(A)'s test is that the Omissions must have been "material to the bankruptcy case." *See Sholdra*, 249 F.3d at 382. This requirement is satisfied if the omitted asset or transaction "bears a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *See Beaubouef*, 966 F.2d at 178 (internal quotations omitted).

---

[14] Acquisition Agreement ($14,400,000 worth of shares) + Stock Sale ($17,501) + Mineral Deed ($44,244.98) = $14,461,745.98. This total does not even account for the Trust or the New Mexico Property.

In *Beaubouef*, the Court of Appeals for the Fifth Circuit considered whether a bankruptcy judge erred in concluding that a debtor's failure to disclose a "worthless" interest in a company had properly been considered a material omission. *Id.* at 179. The Court found no error, stating that "[a] recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. . . . Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them."

There is no question that the Omissions were material to Debtor's bankruptcy case. Unlike in *Beaubouef*, the sum total of the assets and transfers which Debtor failed to disclose is in the tens of millions of dollars. If failing to disclose a "worthless" interest in a company can constitute a material omission, the Omissions must also be considered as such. It was not for Debtor to say which assets and transfers should be disclosed in the Schedules and SOFA.

For the foregoing reasons, the court concludes that CULS has met its burden with respect to all five elements of section 727(a)(4)(A). Debtor's discharge must be denied.

### iv. Debtor's Rule 9(b) Objection

Debtor objected at trial and argues in the Response that Plaintiff is barred by Rule 9(b) of the Federal Rules of Civil Procedure from alleging that Debtor made false oaths by failing to disclose the Stock Sale. Rule 9(b) states that "[when] alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). CULS alleged incorrectly in the Complaint that the Stock Sale took place on October 13, *2009*, when it fact occurred on October 13, *2008*. Debtor therefore takes the position that, by misstating the date of the Stock Sale in the Complaint, CULS failed to state with particularity

any false statements made in connection the Stock Sale, and thus should have been barred by Rule 9(b) from presenting evidence respecting the Stock Sale at trial.

Debtor's argument is unpersuasive; even if Debtor is correct regarding the applicability and effect of Rule 9(b) here, the number and significance of Debtor's other omissions would require the court to deny his discharge. Assuming Rule 9(b) does apply to allegations brought under section 727(a)(4)(A), it makes little sense to interpret that rule to require a plaintiff to list every false oath or concealment in a complaint. Under Rule 4004 of the Federal Rules of Bankruptcy Procedure, the plaintiff must file a complaint seeking denial of discharge no later than 60 days after the first date set for the creditors' meeting conducted pursuant to section 341(a) of the Code. *See* FED. R. BANKR. P. 4004.[15] Debtor's argument respecting Rule 9(b), if accepted by the court, therefore poses the following dilemma for a party objecting to discharge: on the one hand, amending a dischargeability complaint after the expiration of this 60-day period may be improper, given Rule 4004;[16] on the other hand, pinpointing errors in the debtor's schedules is likely to require time-consuming investigation and, oftentimes, the commencement of formal discovery; though the debtor likely knows what he or she omitted from the schedules, the objecting party does not. Given the limitations imposed by Rule 4004, adopting Debtor's

---

[15] As Rule 2003(a) of the Federal Rules of Bankruptcy Procedure requires that the meeting of creditors must be held (in a chapter 7 case) no more than 40 days after the order for relief, a party objecting to a debtor's discharge in a typical case will have no more than 100 days within which to formulate allegations.

[16] The court has found only one case addressing the relationship between Rule 9(b) of the Federal Rules of Civil Procedure and Rule 4004(a) of the Federal Rules of Bankruptcy Procedure. *See Chicago Title Ins. Comp. v. Mart (In re Mart)*, 90 B.R. 556 (Bank. S.D. Fla. 1998). In comparing the two rules, the *Mart* Court stated:

> When there is no pleading deadline, the purpose of Rule 9(b) may be served by requiring or permitting a more definite statement. However, where the mandatory deadline for the statement of the claim has expired and this court is prohibited by Rule 4004 from extending that deadline, permitting amendment would evade that rule and exceed this court's discretion. It would also permit this plaintiff to defeat the purpose of Rule 9(b) by completely ignoring it as plaintiff did in this case.

*Id.* at 559.

interpretation of Rule 9(b) would effectively place on a creditor or the trustee objecting to a debtor's discharge pursuant to section 727(a)(4)(A) the wholly unrealistic burden of discovering and alleging every false oath before the end of the 60-day period.  The court therefore concludes that a party alleging under section 727(a)(4)(A) that a debtor's schedules contain *some* errors or omissions may offer evidence of other, non-pled errors or omissions in court.

### v.  Conclusion

For the reasons stated above, the court concludes that Debtor's discharge must be denied pursuant to Code § 727(a)(4)(A).  Counsel for Plaintiff shall prepare and submit a final judgment to such effect, providing a copy to Debtor's counsel.

#### END OF MEMORANDUM OPINION ####